# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | | |
|---|---|---|
| JOSHUA HARMS, | : | |
| | : | **Case No:** 5:18-cv-4023 |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **VERIFIED COMPLAINT** |
| | : | |
| CITY OF SIBLEY, IOWA, GLENN | : | |
| ANDERSON, Sibley City Administrator, | : | |
| *in his individual and official capacity,* and | : | |
| SUSAN SEMBACH, Sibley City Clerk, | : | |
| *in her individual and official capacity,* | : | **JURY TRIAL DEMANDED** |
| | : | |
| **Defendants.** | : | |
| | : | |

## VERIFIED COMPLAINT

**COMES NOW** Plaintiff **Joshua Harms** through undersigned counsel and respectfully alleges the following:

## INTRODUCTION

This civil rights suit seeks to protect the right to engage in core political speech at the heart of the First Amendment. Plaintiff Joshua Harms—a lifelong resident of Sibley, Iowa who loves his community and wants to see it thrive—is facing a prior restraint on the content of his personal website, http://shouldyoumovetosibleyia.com, as well as unconstitutional retaliation for his criticism of the City of Sibley, Iowa and its municipal government.

Like many small Iowa towns, Sibley has struggled to maintain its population and most crucially to attract enough well-paying jobs to retain its younger population. To help remedy this problem, in 2013 Sibley used tax-breaks to lure Iowa Drying and Processing ("IDP") to move its operations to Sibley. While fortunately, IDP does employ 26 individuals, unfortunately, with it

1

arrived a pungent and foul odor to Sibley that has been the subject of numerous nuisance citations and of protracted litigation between IDP and Sibley.

Frustrated by IDP's odors and by Sibley's inability to adequately control the problem, Harms created his website. His goals were to inform the public of the ongoing problem, to criticize the inaction of Sibley and its officials, and to spur on his municipal government to finally take action to reign in the odors. Eventually, thanks mostly to Facebook shares, http://shouldyoumovetoSibleyIA.com went viral by Sibley standards, with over 2000 visits in a matter of days. Finally drawing the attention of the Sibley city council over three years after the creation of the website, Sibley City Administrator and Sibley City Clerk gave a presentation to City Council on Harms website and the alleged Harms it was causing Sibley. Following that presentation, Defendants directed its attorneys to issue a cease and desist letter to Harms "to get it down" by threatening litigation unless he altered or removed his website. Reasonably intimidated, Harms altered his website. Brazenly, the City's attorneys then further instructed Harms not to speak with the press about their censorship of his website.

One of the cornerstones of our constitutional democracy is the right of to be free from prior restraint or retaliation for engaging in protected expression like the website Harms posted here. But for Harms, this constitutional right was abused by the very public servants who took an oath to uphold the Constitution.

Accordingly, plaintiff seeks damages and declaratory and injunctive relief to enjoin Defendants from bringing a retaliatory lawsuit and to enjoin Defendants from prevents Plaintiff from changing his website and speaking with any reporters interested in speaking with him about his website or the City of Sibley.

## JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the First and Fourteenth Amendments to the United States Constitution. Title 28 U.S.C. §§ 1331 and 1343 provide this Court subject matter jurisdiction in this matter.

2. The Court has authority to issue declaratory and injunctive relief under 28 U.S.C. § 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

3. Venue is proper in the Western Division of the Federal District Court for the Northern District of Iowa under 28 U.S.C. §§ 1391(b)(1) and (2) because defendants reside in Sibley, Iowa within the Northern District of Iowa and the incidents giving rise to this claim occurred within this district.

## PARTIES

4. Plaintiff Joshua Harms ("Harms") was at all times relevant to this Verified Complaint a resident of Sibley, Iowa situated in Osceola County, Iowa.

5. Defendant City of Sibley, Iowa ("Sibley") is a municipal corporation organized pursuant to the laws of the State of Iowa. Sibley and its agents have a legal responsibility to operate according to the laws of the United States and the State of Iowa, including, but not limited to, the United States Constitution.

6. Defendant Glenn Anderson ("Anderson") was at all times relevant to this Verified Complaint the City Administrator for the City of Sibley Iowa. In his capacity as City Administrator, Defendant Anderson had a legal obligation to act in conformity with the United States and Iowa Constitutions and other applicable federal and state laws. Defendant Anderson is sued in his individual and official capacities. At all times relevant to this Verified Complaint, he was acting within the scope and course of his employment with the City of Sibley and the

3

City of Sibley City Council. At all times relevant to this Verified Complaint he was acting under color of the laws of the State of Iowa and the City of Sibley.

7. Defendant Susan Sembach ("Sembach") was at all times relevant to this Verified Complaint the City Clerk for the City of Sibley Iowa. In her capacity as City Clerk, Defendant Sembach had a legal obligation to act in conformity with the United States and Iowa Constitutions and other applicable federal and state laws. Defendant Sembach is sued in her individual capacity and official capacities. At all times relevant to this Verified Complaint, she was acting within the scope and course of her employment with the City of Sibley and the City Council of Sibley. At all times relevant to this Verified Complaint, she was acting under color of the laws of the State of Iowa and the City of Sibley.

## FACTUAL ALLEGATIONS

### Joshua Harms & Sibley, Iowa

8. Plaintiff Joshua Harms is a 28 year old resident of Sibley, Iowa.

9. Harms was born in Sibley, and, apart from a brief period in childhood when he resided in Ocheyedan, Iowa, he has been a lifelong resident.

10. In fact, most of Harms's family members also live in or around Sibley.

11. Harms has been a student in Sibley, is now a homeowner in the town, and currently works there as lead computer programmer at the Keith Merrick Company.

12. In addition, Harms owns his own programming business, Nozzlegear Software, which builds computer and phone applications and Harms has written a book to help programmers build applications.

13. Needless to say, Harms cares deeply about the success of his town.

4

14. Sibley is the county seat of Osceloa County and is located in northwest corner of Iowa approximately eight miles from the southern border of Minnesota.

15. Sibley is the oldest town in Osceloa County, and its population is approximately 2,622 residents.

16. In many ways, Sibley is a wonderful small town: it's picturesque, its people are friendly, and for the most part, neighbors support one another.

17. But like many small towns in rural Iowa, Sibley has struggled to retain residents.

18. To remedy this, it has worked to maintain existing businesses and jobs, and to attract new businesses and jobs to the community.

**Iowa Drying and Processing and Sibley's Odor Problem**

19. In 2013, in an effort to lure industry and jobs to town, Sibley and the State of Iowa provided tax breaks and incentives to Iowa Drying and Processing ("IDP") to move its operations to Sibley.

20. IDP operates out of the former Associated Milk Producers Inc. plant at 1020 4th Ave, Sibley, IA, 51249, employs 26 individuals, and specializes in the contract manufacturing and processing of food and feed-grade products, such as high-protein animal feed supplements for companion and domestic animals. In short, IDP makes dog food.

21. IDP's plant on 4th Avenue is located just a few blocks from Sibley's downtown business district and just across the street from the house Harms resided it at the time.

22. The relationship between Sibley and IDP was initially harmonious, but beginning in 2014, soon after IDP became fully operational, noxious smells began emanating from the plant and wafting over the town.

5

23. The noxious smell subjected the company to numerous complaints from citizens and just as significantly, numerous citations from the city under Sibley's City Code 4-3-3(A).

24. Local residents described the primary odor "as rancid and dead animal-like" and that the smell was and is so strong and foul that it has affected business in the downtown area.

25. In fact, residents have been seen leaving restaurants indicating that the smell was so bad that they couldn't muster the stomach to eat. *See* Ty Rushing, *Sibley cries foul over odors produced by local manufacturer*, Sioux City Journal, Dec. 11, 2016, *available at* http://siouxcityjournal.com/business/sibley-cries-foul-over-odors-produced-by-local-manufacturer/article_4ee829e1-c40e-5bba-9d80-41ce4823f27b.html [hereinafter "*Sibley cries foul*"].

26. Many residents became vocal that IDP was no longer welcome in Sibley:



Credit: Robin Baumgarn/Daily Globe, '*They're not welcome here anymore': Sibley residents tell IDP they've had enough of the smell*, Daily Globe, Mar. 28, 2016, *available at*

6

http://www.dglobe.com/news/3996908-theyre-not-welcome-here-anymore-sibley-residents-tell-idp-theyve-had-enough-smell [hereinafter "*They're not welcome*"].

27. The nuisance abatement citations issued by the city fined IDP for the offensive odors and were the beginning of a period of protracted litigation between IDP and Sibley. Rushing, *Sibley cries foul.*

28. In 2016, IDP and its attorneys did not appear in court to respond to the nineteen nuisance citations and the Iowa district court entered default judgments against the company. Baumgarn, *They're not welcome.*

29. Additionally, the IDP odors were so offensive and became such a contentious issue among Sibley residents that a significant amount of time at City Council meetings was being devoted to the issue, including abatement hearings, and to residents expressing their concerns and anger.

30. Despite IDP's influx of jobs, Sibley residents were so frustrated by IDP's inability to resolve the odor issue that many expressed their desire for the Sibley to shut IDP down or for IDP to voluntarily sell its business.

31. Feeling community pressure, Sibley itself finally filed a lawsuit against IDP over the odor issue.

32. IDP ultimately counter-sued, and that lawsuit was finally settled or resolved in or around July 2017.[1]

---

[1] Even more recently, IDP has sued the City of Sibley, Iowa to challenge its odor ordinance. *Nick Hytrek, Plant owner sues Sibley over odor ordinance*, Feb. 20, 2018, *available at* http://siouxcityjournal.com/news/local/crime-and-courts/plant-owner-sues-sibley-over-odor-ordinance/article_98bde1fd-385f-5143-94d4-1847f7421a22.html.

7

**Harms & the http://shouldyoumovetosibleyia.com Website**

33. Because of his close proximity to IDP, Harms was acutely aware of the IDP's odor problem.

34. In fact, the odors were so offensive and obnoxious that Harm could not open his windows and could not run the AC in his car without being overwhelmed.

35. Harms paid particular attention to Sibley's response to the problem, reading the minutes to every Sibley City Council carefully to see what, if any, steps City Council was taking to address the problem.

36. Like many of Sibley's residents, Harms was disheartened that despite the nuisance citations, the City was failing to hold IDP accountable and to ultimately resolve the odor problem.

37. Harms become so fed up by his belief that Sibley was not taking residents' concerns seriously that he did two things: (1) on July 3, 2015, he used his programming skills to build a website entitled "Should You Move to Sibley, IA" located at the domain http://shouldyoumovetosibleyia.com; and (2) in August of 2016, Harms, after initially considering moving out of town to buy a new home and avoid the IDP smell, moved to a different house on the other side of Sibley in what was an ultimately futile attempt to get away from IDP and its odors.

38. Harms's website gave information about the ongoing IDP-Sibley fiasco.

39. The website's homepage boldly proclaimed "Should you move to Sibley, Iowa? NO."[2]

---

[2] The answer to "should you move to Sibley, Iowa" was "No" from the origin of the website in July 2015, until March 11, 2016, when, buoyed by the filing of Sibley's lawsuit against IDP, Harms optimistically changed the answer to "Not Yet." Of course, as detailed in this Complaint, Harms ended up changing the answer to that question one more time, following the City's threat of litigation, to "Only You Can Answer That."

40. The original version of Harms's website also contained an automatically updated date line that read: "Sibley still being polluted as of [the date viewed]."

41. In addition to describing the IDP odor as a "horrible rotten blood and stale beer" smell and noting that "you can't escape the stench no matter where you are in town," Harms's website encouraged visitors to attend public hearings at the Osceloa County Courthouse to voice complaints and to call the Sheriff, the City of Sibley or Sibley City Attorney Harold Dawson's office to make a complaint.

42. Harms also occasionally updated the website with news of the ongoing litigation against IDP, including the fact that IDP's emissions had been deemed a nuisance injurious to the city residents' health, and that despite the fact the Sibley had ordered IDP to deposit $50,000 into an escrow account to hire an engineer to study IDP operations, Sibley had taken no further action when IDP failed to make the deposit.

43. Although published in July of 2015, it was not until approximately December 2015 that the website started to receive significant attention—as posted on Harms's website, on December 2, 2015, http://shouldyoumovetoSibleyIA.com was viewed 2100 times by 1900 people, the majority of which were people from the Sibley area.

44. In a town of 2,622 people, that is as big as it gets. By early 2016, Harms's website had seemingly gone "viral," with many Sibley residents sharing the website over the social media site Facebook.

45. Despite this notoriety, and despite the positive feedback on the website received by Facebook users, Harms noted Sibley had still not solved the problem and that it was "an embarrassment that this has been a problem so long."

9

**Sibley Threatens Harms With Litigation Unless He Takes Down His Website**

46. Although the website had apparently come to City officials' attention as early as the summer or fall of 2015, Sibley directly took up the issue of Harms's website at the December 11, 2017, City Council meeting.

47. At the December 11, 2017, meeting, Sibley City Administrator Glenn Anderson and Sibley City Clerk Susan Sembach presented information about Harms's website to the Sibley City Council.

48. Anderson and Sembach described the website to council members, indicating that it contained derogatory and outdated information, and did not accurately reflect the City's efforts to resolve a significant amount of IDP's odor problem.

49. Although the website contained "updates," Anderson and Sembach said, and therefore gave the illusion of being current, it was instead, hopelessly out of date.

50. Most importantly, Anderson and Sembach told council that they believed they knew who the author of the website was, and that they were working with the Sibley City Attorney Harold Dawson to attempt to get the website taken down.

51. Based upon information and belief, at the December 11, 2017, meeting, Anderson and Sembach and the Sibley City Council authorized a cease and desist letter be sent to Harms.

52. These occurrences were briefly documented in the city's minutes for the December 11, 2017 meeting, as published in the local newspaper, the Gazette Tribune, on December 13, 2017, providing: "Discussed a negative website regarding moving to Sibley that was posted—attorney sending letter to get it down…" *Legals: City Council Minutes*, Gazette-Tribune, Dec. 20, 2017, at 10.

53. They were also noted by the local reporter covering the city council meeting: "For council's information, Anderson and Sambach gave details about a website (shouldyoumovetosibleyia.com) that voices concerns as a deterrent to someone considering moving to Sibley based on the IDP odor issue, that while still not 100% eliminated, has improved. They think they have determined who the perpetrator is and are working with the city attorney to attempt to remove the site. The information is outdated, but the website dating [sic] updates that it looks current." Sandra Jenson, *Sibley City Council discusses Chamber position, receives positive fund news*, Gazette-Tribune, Dec. 20, 2017, at 1.

54. Pursuant to that authorization from Anderson, Sembach and the Sibley City Council, a cease and desist letter dated December 12, 2017, was sent on behalf of the City of Sibley to Harms by attorney Daniel E. Dekoter of the law firm of Dekoter, Thole, Dawson, Rockman, P.L.C.

55. Dekoter indicated his firm represented the City and that Harms's website "libel[ed] the City of Sibley, interfer[ed] with recruitment of businesses and new residents, and negatively affect[ed] property values."

56. DeKoter and Sibley told Harms that if he did not "take down" his website and replace it with "non-derogatory material" within ten days, Sibley would pursue litigation against Harms.

57. Harms received Sibley's cease and desist letter on approximately December 17, 2017.

**<u>Chilled By The Threat of Litigation, Harms Changes His Website & Refrains from Speaking to the Press</u>**

11

58.     Scared by this threat of litigation, Harms immediately sought legal advice in the form of free consultation from a local Sibley lawyer who referred Harms to a lawyer in Le Mars, Iowa, so the lawyer wouldn't be closely connected with Sibley.

59.     Told that making changes or updates to the website would be prudent given the threat of litigation, on December 19, 2017, Harms made a number of changes to his site, including but not limited to the following:

a.  He changed the answer to his question, "Should you move to the Sibley, Iowa?" from "Not Yet" to "Only you can answer that".

b.  He added "But if you can't decide, I'll give you my *opinion* on both the good and the bad so that you can make an informed decision (emphasis in original)"; and

c.  "Throughout the rest of this page, I'm going to do my best to explain that Sibley has a lot of good things going for it."

60. In addition to those changes, Harms added a list of things he liked about living in Sibley to the website.

61. He added text stating that while sometimes still present, odors from IDP are not as noticeable much of the time.

62. Shortly after receiving the cease and desist letter and making changes to his website, a local reporter, Lana Bradstream with the Northwest Iowa Review, left a voicemail with Harms indicating that he would like to speak with him about his website and about Sibley's threats of litigation.

63. Almost immediately after that, Harms was contacted by another attorney with Dekoster, Thole, Dawson, Rockman, P.L.C. asking Harms to meet him for coffee to discuss the website.

12

64. At that meeting, the attorney reiterated Sibley's request to Harms that he immediately remove the website because Sibley believed it was hurting the city's image and was hurting business in Sibley.

65. In addition, the attorney told Harms that he knew reporter Bradstream was trying to speak to Harms about this situation.

66. The attorney indicated to Harms that it would not be Harms's best interest to speak with and/or do an interview with the Bradstream.

67. In light of this verbal warning and the letter he received from the same firm, Harms was fearful of what the City would do if he was quoted in the local paper.

68. As a result, Harms called Bradstream back and told her that he could not give her and interview about his website and what had happened to him.

69. On Saturday, December 30, 2017, Bradstream's article, "Sibley Officials Mull 'Negative' Website," appeared in The Northwest Iowa Review. Lana Bradstream, "*Sibley officials mull 'negative' website*," N'West Iowa Review, Dec. 30, 2017 [hereinafter "*Sibley officials mull*"].

70. Backstream's article noted that dramatic changes had been made to Harms's website recently. *Id.*

71. Perhaps afraid of the potential legal consequences of their previous outlandish conduct to censor Harms, Anderson, Sibley Mayor Jerry Johnson ("Johnson"), and Council member Larry Pedley ("Pedley") denied to the reporter that they had authorized the letter that was sent to Harms. *Id.*

72. Johnson would not identify the sender to Backstrom, but when pressed he did say "[t]here might be some legal stuff coming down the road" and that this was "a sticky thing." *Id.*

73. Sibley City Attorney Harold Dawson also denied sending the letter to Harms. *Id.*

13

74. However, in the same article, Backstrom quoted Dawson as saying, "the website made it sound like the [odor] problem was continuing." *Id.*

75. The City Attorney attempted to justify the prior unconstitutional censorship by drawing a line at what he considered to be factual versus opinion statements, stating "It was originally not an opinion piece, but stated facts that existed two years ago." Bradstream, *Sibley officials mull.*

76. Council member Pedley said that Harms's website was a detriment to Sibley and its businesses and "[y]ou would do a search of Sibley and end up on that site."

77. The article closed by noting "[Mayor] Johnson said he hopes the website it [sic] eventually taken down, even the revised edition." *Id.*

78. Because of the City's instruction to Harms not to speak to the press, despite its own doing so, the story contains no statement or refutations from Harms.

**The Second Sibley Letter & Harms's Current Fears About Updating the Website**

79. In the aftermath of Bradstream's article, Harms received another letter from Sibley and Dekoter dated January 18, 2018, that attempted to explain and justify Sibley's previous threats of litigation.

80. Saying that Iowa recognized a cause of action for "slander upon title," Sibley asserted that Harms's previous version of the website "disparaged property in Sibley" and contained knowingly "factually false" statements.

81. Sibley accused Harms "or the lawyer [he] consulted" of "making a stupid argument" by apparently thinking that Harms original website was speech protected by the First Amendment to the United States Constitution.

82. At no point did the letter inform Mr. Harms that in fact the First Amendment allows no such action for defamation by a government against a citizen.

14

83. Although Dekoter and Sibley in one breath indicated that "this letter is not a threat of litigation and is not in any way intended to deter your exercise of your legal rights," in the other it explicitly indicated to Harms that he was only within his legal rights "to publish the web site *in its current form*." (emphasis added).

84. In fact, the January 18 letter reiterated that Harms's previous website content "affected the decision of a doctor who was looking at Sibley as a possible home."

85. Despite Harms's desire to continue informing his fellow citizens about the IDP odor problem and Harms's belief that Sibley was not adequately addressing the issue, Sibley's letters together gave Harms the reasonable impression that the City would sue him or not entirely based on its own arbitrary criteria of whether Harms had engaged in a sufficient amount of speech positive about Sibley, and how many iterations of the statement that his website represented his opinion it determined were adequate.

86. Therefore, Harms has not made any additional updates or other changes to his website since December 19, 2017, despite his desire to do so.

87. As a direct result of the specter of litigation, Harms has been chilled from exercising his right to criticize his local government in at least the following specific ways:

    a. He would like to remove the various statements on his website that it represents only his opinion and not fact, as well as any other disclaimers he added only after the threat of litigation first arose.

    b. He wants to post the December 12, 2017 letter he received from Sibley on his website to refute Sibley officials' denial in the local press that it sent him the letter.

15

c.  He would have liked to, and still would like to, talk to Backstrom after her original article to correct the record; however, he was afraid that Sibley might find something Harms said to Bradstream "libelous."

d.  Harms would like to add a form to his website where other Sibley residents could instantaneously report any incident of continuing odor from IDP.

e.  Finally, Harms had planned to purchase the domain "sibleystinks.com" specifically for reporting IDP odors.

88. Even buying the "sibleystinks.com domain without adding any content scared Harms as the City was tracking his online life.

89. Sibley's December 12, 2017, letter let Harms know that Sibley officials knew when he reregistered his domain and enclosed documents showing Harms's ownership and authorship of "shouldyoumovetosibleyia.com."

90. Harms's continuing fear of litigation has prevented him from changing or updating his website, speaking with reporters, and creating a second website to report on IDP odors.

**CAUSES OF ACTION**
**COUNT I**
**42 U.S.C. § 1983 – CONSTITUTIONAL TORT - FIRST AMENDMENT RETALIATION – DEFENDANTS SIBLEY, ANDERSON & SEMBACH**

91. Plaintiff incorporates by reference the allegations of all paragraphs as though set forth at length herein.

92. Publicly criticizing the actions of Harms's city and his city officials is conduct protected by the First Amendment to the United States Constitution.

93. Defendants' conduct in authorizing and threatening litigation if Harms did not remove or change his criticism chilled Harms from exercising that right and constituted unconstitutional

16

retaliation and harassment for Plaintiff engaging in activity protected by the First Amendment to the United States Constitution.

94. Furthermore, Defendants' conduct in threatening Harms if he chose to speak with reporter Lana Bradstream chilled Harms and constituted additional retaliation on Harms's free speech rights under the First Amendment to the United States Constitution.

95. As a result of Defendants' unconstitutional conduct, Harms has suffered damages.

## COUNT II
## 42 U.S.C. § 1983 - CONSTITUTIONAL TORT – PRIOR RESTRIANT ON FREE SPEECH – DEFENDANTS SIBLEY, ANDERSON & SEMBACH

96. Plaintiff incorporates by reference the allegations of all paragraphs as though set forth at length herein.

97. Plaintiff has a clearly established right under the First Amendment to publish and/or publicize information that is critical of his town and of the actions of his town whether that publication occurs on a website or occurs by speaking with a local reporter.

98. Defendant Sibley's actions in threatening Plaintiff with litigation unless he removed or made changes to his website constitute a prior restraint on Plaintiff's speech in violation of his First Amendment rights.

99. Furthermore, Defendants' actions in telling Plaintiff not to speak with reporter Lana Bradstream constitute a prior restraint on Plaintiff's speech in violation of his First Amendment rights.

100.    Finally, Defendants' restriction on Harms's ability to create additional websites critical of the City or documenting instances of IDP odors constitutes an impermissible prior restraint on his speech.

101.    As a result of Defendants' unconstitutional conduct, Harms has suffered damages.

17

18

## COUNT III
## 42 U.S.C. § 1983 - CONSTITUTIONAL TORT – VIEWPOINT-BASED RESTRICTION OF SPEECH – DEFENDANTS SIBLEY, ANDERSON & SEMBACH

102.     Plaintiff incorporates by reference the allegations of all paragraphs as though set forth at length herein.

103.     Governmental efforts to regulate speech based on the "specific motivating ideology or the opinion or perspective of the speaker" is a "blatant" and "egregious" form of impermissible speech restriction. *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

104.     Unlike content-based restrictions, subject to strict scrutiny and forum analysis, viewpoint discrimination by the government of private speech is flatly prohibited—beyond the reach of government. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 391–92 (1992) (holding that a state may not selectively ban fighting words on the basis of viewpoint, even though it may ban fighting words entirely).

105.     Indeed, preventing the government from engaging in viewpoint discrimination has long been the central concern of the First Amendment. *See, e.g.,* Joseph Blocher, *Viewpoint Neutrality and Government Speech*, 52 B.C.. L. Rev. 695, 703-05 (2011).

106.     In this case, Defendants singled out Harms's speech for investigation, retaliation, and prior restraint based on its "derogatory," "negative," and "disparaging" viewpoint.

107.     This outrageous viewpoint based regulation of Harms's private speech violates the First Amendment.

108.     As a result of Defendants' unconstitutional conduct, Harms has suffered damages.

19

## COUNT IV
## 42 U.S.C. § 1983 - CONSTITUTIONAL TORT – CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS – DEFENDANTS SIBLEY, ANDERSON & SEMBACH

109.     Plaintiff incorporates by reference the allegations of all paragraphs as though set forth at length herein.

110.     42 U.S.C. Section 1985(3) provides that if two or more persons conspire for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

111.     Defendants acted jointly in concert as co-conspirators to unlawfully censor Harms and restrict his right to free speech by threat of litigation unsupported by the law. Defendants sought to intimidate Harms, thus seeking to accomplish an unlawful purpose by unlawful means.

112.     Defendants evidenced their conspiracy openly in multiple comments to the press detailed herein.

113.     This conduct was objectively unreasonable and was undertaken intentionally and with reckless indifference to Harms's constitutional rights and the constitutional rights of all Sibley residents to criticize the government under the First and Fourteenth Amendments to the U.S. Constitution.

114.     As a result of Defendants' actions and in furtherance of their conspiracy, Harms has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, Harms respectfully requests the following:

a. A declaratory judgment that the First Amendment protects Harms's ability to author and publish his website, http://shouldyoumovetosibleyia.com (in original, uncensored form), his ability to speak with reporter Lana Bradstream, and his ability to create a new website, sibleystinks.com, and that Defendants' threats to sue Harms for doing so are unlawful retaliation that violates the First Amendment;

b. A declaratory judgment that the Defendants' past and ongoing threats of litigation for the same also constitutes an unconstitutional prior restraint on Harms's First Amendment rights;

c. A declaratory judgment that a claim for municipal defamation is not actionable and there was no legal basis for Defendants to threaten such a claim;

d. An injunction, preliminary and permanent thereafter, enjoining Defendants, their employees, agents, assigns and all those acting in concert with them, from bringing a lawsuit against Harms for publishing his website or any website that criticizes the Defendants and the Defendants actions in conducting city business;

e. An award of compensatory damages against all Defendants, joint and severally, in an amount to be determined at trial;

f. An award of punitive damages against all Defendants;

g. An award for costs, expenses and attorney's fees pursuant to 42 U.S.C. § 1988; and

h. Such other relief as this Honorable Court may deem just and deserving.

21

**JURY DEMAND**

A trial by jury is hereby demanded.

March 8, 2018.

Respectfully submitted,

*s/Glen S. Downey*
Glen S. Downey
AT0012428

s/Nathan A. Mundy
Nathan A. Mundy
AT0009065

DOWNEY & MUNDY, PLLC
303 E. Court Avenue
Des Moines, IA  50309
Tel: (515) 288-1552
Fax: (515) 259-7599
glen@downeymundy.com
nathan@downeymundy.com

/s/ Rita Bettis
**Rita Bettis**, AT0011558

ACLU OF IOWA FOUNDATION, INC.
505 Fifth Ave., Ste. 808
Des Moines, IA 50309–2316
Telephone: 515.243.3988
Fax: 515.243.8506
Email:  Rita.Bettis@aclu-ia.org

*Counsel for Plaintiff JOSHUA HARMS*

I, JOSHUA HARMS, being duly sworn upon oath, do depose and state that I am the PETITIONER in this matter, and that I have read the foregoing Verified Complaint and the statements and allegations therein are true and correct as I verily believe.

_Joshua Harms_
JOSHUA HARMS

STATE OF ___Iowa___,  )
                       )ss.
COUNTY OF ___Osceola___.  )

Subscribed and sworn before me this _7th_ day of _March_, 2018.

_Connie Schwarzkopf_
NOTRARY PUBLIC, STATE OF IOWA

CONNIE SCHWARZKOPF
Commission Number 147430
My Commission Expires
7-7-18