# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| **JOSHUA HARMS,** | Case No. 5:18-cv-4023 |
| Plaintiff, | |
| v. | |
| **CITY OF SIBLEY, IOWA, GLENN ANDERSON, Sibley City Administrator**, *in his individual and official capacity,* and **SUSAN SEMBACH, Sibley City Clerk**, *in her individual and official capacity*, | **BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

### TABLE OF CONTENTS

INTRODUCTION ................................................................................................2

FACTUAL BACKGROUND ................................................................................2

ARGUMENT .....................................................................................................13

I.     Legal Standard ........................................................................................13

II.    Plaintiff Will Likely Prevail on the Merits of His Claims ........................15

    A.    Claim 1: First Am. Retaliation. .....................................................15

    B.    Claim 2: Prior Restraint. ..............................................................24

    C.    Claim 3: Viewpoint Discrimination. .............................................29

III.    Plaintiff Is Suffering Irreparable Harm ....................................................31

IV.    The Balance of Hardships Favors Plaintiff ...............................................32

V.    Granting a Preliminary Injunction for Plaintiff Will Further the Public Interest .....................................................................................................33

1

CONCLUSION......................................................................................34

## INTRODUCTION

This is a civil rights suit brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the First and Fourteenth Amendments to the United States Constitution. It seeks to protect the right to engage in core political speech at the heart of the First Amendment. Plaintiff Joshua Harms—a lifelong resident of small town Sibley, Iowa, who loves his community and wants to see it thrive—is facing a content- and viewpoint-based prior restraint on the content of his personal website, http://shouldyoumovetosibleyia.com, as well as unconstitutional retaliation for his criticism of the City of Sibley, Iowa and its municipal government. Given the extraordinary nature of Defendants' censorship, Harms is seeking a preliminary injunction to protect his First Amendment rights during the pendency of this challenge.

## FACTUAL BACKGROUND[1]

In many ways, Sibley is a wonderful small town: it's picturesque, its people are friendly, and for the most part, neighbors support one another. V.Compl. ¶ 16. But like many small towns in rural Iowa, Sibley has struggled to retain residents, especially its younger generation. V.Compl. ¶ 17. To remedy this, it has worked to maintain existing businesses and jobs, and to attract new businesses and jobs to the community. V.Compl. ¶ 18. In 2013, Sibley used tax-breaks to lure Iowa Drying and Processing ("IDP") to move its operations to Sibley. V.Compl. ¶ 19.

Unfortunately, with those 26 jobs arrived a pungent and foul odor that has been the subject of numerous nuisance citations and of protracted litigation between IDP and Sibley.

---

[1] This statement of facts is taken from Plaintiff's Verified Complaint and attached Exhibits A-E, which are fully incorporated herein by reference.

V.Compl. ¶ 27. IDP specializes in the contract manufacturing and processing of food and feed-grade products, such as high-protein animal feed supplements for companion and domestic animals. V.Compl. ¶ 20. IDP makes dog food. *Id.* IDP's plant on 4th Avenue is located just a few blocks from Sibley's downtown business district and just across the street from the house Harms resided in at the time it came to town. V.Compl. ¶¶ 20, 33.

Plaintiff Joshua Harms is a 28 year old resident of Sibley, Iowa. V.Compl. ¶ 8. He was born in Sibley, and, apart from a brief period in childhood when he resided in Ocheyedan, Iowa, he has been a lifelong resident. V.Compl. ¶ 9. In fact, most of Harms's family members also live in or around Sibley. V.Compl. ¶ 10. Harms has been a student in Sibley, is now a homeowner in the town, and currently works there as lead computer programmer at the Keith Merrikk Company. V.Compl. ¶ 11. In addition, Harms owns his own programming business, Nozzlegear Software, which builds computer and phone applications and Harms has written a book to help programmers build applications. V.Compl. ¶ 12. Needless to say, Harms cares deeply about the success of his town. V.Compl. ¶ 13.

The relationship between Sibley and IDP was initially harmonious, but beginning in 2014, soon after IDP became fully operational, noxious smells began emanating from the plant and wafting over the town. V.Compl. ¶ 22. The noxious smell subjected the company to numerous complaints from citizens and just as significantly, numerous citations from the city under Sibley's City Code 4-3-3(A). V.Compl. ¶ 23. Local residents described the primary odor "as rancid and dead animal-like" and that the smell was so strong and foul that it has affected business in the downtown area and that residents have been seen leaving restaurants indicating that the smell was so bad that they couldn't muster the stomach to eat. V.Compl. ¶¶ 24, 25; *See* Ty Rushing, *Sibley cries foul over odors produced by local manufacturer*, Sioux City Journal,

Dec. 11, 2016, *available at* http://siouxcityjournal.com/business/sibley-cries-foul-over-odors-produced-by-local-manufacturer/article_4ee829e1-c40e-5bba-9d80-41ce4823f27b.html [hereinafter "*Sibley cries foul*"].

Many residents became vocal that IDP was no longer welcome in Sibley[2]:



Credit: Robin Baumgarn/Daily Globe, '*They're not welcome here anymore': Sibley residents tell IDP they've had enough of the smell*, Daily Globe, Mar. 28, 2016, *available at*

---

[2]     The nuisance abatement citations issued by the city fined IDP for the offensive odors and were the beginning of a period of protracted litigation between IDP and Sibley. V.Compl. ¶ 27; Rushing, *Sibley cries foul*. In 2016, IDP and its attorneys did not appear in court to respond to nineteen nuisance citations and the Iowa district court entered default judgment against the company. V.Compl. ¶ 28; Baumgarn, *They're not welcome.*

The IDP odors became such a contentious issue among Sibley residents that a significant amount of time at City Council meetings was being devoted to the issue. V.Compl. ¶ 29.  Many residents expressed their desire for Sibley to shut IDP down or for IDP to voluntarily sell its business. V.Compl. ¶ 30.  Feeling community pressure, Sibley itself finally filed a lawsuit against IDP over the odor issue. V.Compl. ¶ 31.  IDP ultimately counter-sued, and that lawsuit was finally settled or resolved in or around July 2017. V.Compl. ¶ 32.  Even more recently, IDP has sued the City of Sibley, Iowa to challenge its odor ordinance. V.Compl. ¶ 32 n.1; *Nick Hytrek*, *Plant owner sues Sibley over odor ordinance*, Feb. 20, 2018, *available at* http://siouxcityjournal.com/news/local/crime-and-courts/plant-owner-sues-sibley-over-odor-ordinance/article_98bde1fd-385f-5143-94d4-1847f7421a22.html.

4

http://www.dglobe.com/news/3996908-theyre-not-welcome-here-anymore-sibley-residents-tell-idp-theyve-had-enough-smell [hereinafter "*They're not welcome*"]. V.Compl. ¶ 26.

Because he lived across the street from IDP, Harms was acutely aware of IDP's odor problem. V.Compl. ¶ 33. In fact, the odors were so offensive and obnoxious that Harms could not open his windows and could not run the air conditioner in his car without being overwhelmed. V.Compl. ¶ 34. Harms paid particular attention to Sibley's response to the problem, reading the minutes of every Sibley City Council meeting carefully to see what, if any, steps it was taking to address the problem. V.Compl. ¶ 35. Like many of Sibley's residents, Harms was disheartened that despite the nuisance citations, the City was failing to hold IDP accountable and to ultimately resolve the odor problem. V.Compl. ¶ 36.

Disappointed with the continuing ineffectiveness of his local government to remedy the problem, Harms did two things: (1) on July 3, 2015, he used his programming skills to build a website entitled "Should You Move to Sibley, IA" located at the domain http://shouldyoumovetosibleyia.com; and (2) in August of 2016, Harms moved to a different house on the other side of Sibley, in large part to try to get away from IDP and its odors. V.Compl. ¶ 37. Harms's website gave information about the ongoing IDP-Sibley fiasco. V.Compl. ¶ 38. His goals were to inform the public of the ongoing problem, to criticize the inaction of Sibley and its officials, and to spur on his municipal government to reign in the odors.

The original version of the homepage of Harms's website's boldly proclaimed "Should you move to Sibley, Iowa? NO."[3] V.Compl. ¶ 39. It also contained an automatically updated

---

[3] The answer to "should you move to Sibley, Iowa" was "No" from the origin of the website in July 2015, until March 11, 2016, when, buoyed by the filing of Sibley's lawsuit against IDP, Harms optimistically changed the answer to "Not Yet." Of course, Harms ended up changing the answer to that question one more time, following the City's threat of litigation, to "Only You Can Answer That." V.Compl. ¶ 39 n.2.

date line that read: Sibley still being polluted as of [the date viewed]. V.Compl. ¶ 40.  In addition to describing the IDP odor as a "horrible rotten blood and stale beer" smell and noting that "you can't escape the stench no matter where you are in town," Harms's website encouraged visitors to attend public hearings at the Osceloa County Courthouse and to call the Sheriff, the City of Sibley, or Sibley City Attorney Harold Dawson's office to voice complaints. V.Compl. ¶ 41. Harms also occasionally updated the website with news of the ongoing litigation against IDP.[4] V.Compl. ¶ 42.

Although published in July of 2015, it was not until December 2015 that the website started to receive significant attention. V.Compl. ¶ 43. As posted on Harms's website, on December 2, 2015, http://shouldyoumovetoSibleyIA.com was viewed approximately 2100 times by approximately 1900 people, the majority of which were Sibley-area residents (from Sibley, Ocheyedan, Sheldon, and Worthington, Minnesota). *Id.* In a town of 2,622 people, that is as big as it gets. V.Compl. ¶ 44.  Harms's website was reflecting concerns shared by many. *See* Robin Baumgarn, *Sibley residents to breathe easier – they hope*, The Globe, Feb. 25, 2015, *available at* http://www.dglobe.com/news/3687679-sibley-residents-breathe-easier-they-hope ("You know it's bad when your 3-year-old plugs his nose and says, 'Oh the blood plant stinks.'")

By early 2016, Harms's website had seemingly gone "viral," with many Sibley residents sharing the website over the social media site Facebook. *Id.* Despite this notoriety, and despite the positive feedback on the website received by Facebook users, Harms noted Sibley had still

---

[4]     For example, he updated the website to reflect the fact that IDP's emissions had been deemed a nuisance injurious to the city residents' health, and that Sibley had taken no action when IDP failed to make a required $50,000 deposit into an escrow account to hire an engineer to study IDP operations with the purpose of reducing odors. V.Compl. ¶ 42.

6

not solved the problem and that it was "an embarrassment that this has been a problem so long." V.Compl. ¶ 45.

It's at this juncture that Defendants began to work together to violate Harms' free speech rights by squashing his criticism. On December 11, 2017, over three years after the creation of the website, Sibley City Administrator and Sibley City Clerk gave a presentation to City Council on Harms's website and the trouble they believed it was causing. V.Compl. ¶ 46-47; Ex. B; Ex. C. Anderson and Sembach described the website to council members, indicating that it contained derogatory and outdated information, and did not accurately reflect the City's efforts to resolve a significant amount of IDP's odor problem. V.Compl. ¶ 48; Ex. B; Ex. C. Although the website contained "updates," Anderson and Sembach said, and therefore gave the illusion of being current, it was instead, hopelessly out of date. V.Compl. ¶ 49; Ex. B; Ex. C. Most importantly, Anderson and Sembach told the City Council that they believed they knew who the author of the website was, and that they were working with the City Attorney to attempt to get the website taken down. V.Compl. ¶ 50; Ex. B; Ex. C.

These occurrences were briefly documented in the city's minutes for the December 11, 2017 meeting, as published in the local newspaper, the Gazette Tribune, on December 13, 2017, providing: "Discussed a negative website regarding moving to Sibley that was posted—attorney sending letter to get it down…" V.Compl. ¶ 52; *Legals: City Council Minutes*, Gazette-Tribune, Dec. 20, 2017, at 10; Ex. C. They were also noted by the local reporter covering the city council meeting:

> For council's information, Anderson and Sambach gave details about a website (shouldyoumovetosibleyia.com) that voices concerns as a deterrent to someone considering moving to Sibley based on the IDP odor issue, that while still not 100% eliminated, has improved. They think they have determined who the *perpetrator* is, and are working with the city attorney to attempt to remove the site. The information is outdated, but the website dating [sic] updates that it looks current.

7

V.Compl. ¶ 53 (emphasis added); Sandra Jenson, *Sibley City Council discusses Chamber position, receives positive fund news*, Gazette-Tribune, Dec. 20, 2017, at 1; Ex. B.

Following that presentation, Defendants directed Sibley's attorneys to issue a cease and desist letter to Harms "to get it down" and "resolve the site" by threatening litigation unless he altered or removed his website. V.Compl. ¶¶ 51, 54; Ex. B; Ex. C.  A cease and desist letter dated the following day, December 12, 2017, was then sent on behalf of the City of Sibley to Harms by attorney Daniel E. DeKoter of the law firm of DeKoter, Thole, Dawson, Rockman, P.L.C. V.Compl. ¶ 27; Ex. A. Harms received the letter on approximately December 17, 2017. V.Compl. ¶ 54. DeKoter indicated his firm represented the City and that Harms' website "libel[ed] the City of Sibley, interfer[ed] with recruitment of businesses and new residents, and negatively affect[ed] property values." V.Compl. ¶ 55; Ex. A. DeKoter told Harms that if he did not "take down" his website and replace it with "non-derogatory material" within ten days, Sibley would pursue litigation against Harms. V.Compl. ¶ 56; Ex. A.

Reasonably intimidated by this threat of litigation, Harms immediately sought legal advice in the form of free consultation from a local Sibley lawyer. V.Compl. ¶ 58. Told that making changes or updates to the website would be prudent given the threat of litigation, on December 19, 2017, Harms made a number of changes to his site, V.Compl. ¶ 59, including but not limited to the following:

    a.  He changed the answer to his question, "Should you move to the Sibley, Iowa?" from "Not Yet" to "Only you can answer that."

    b.  He added "But if you can't decide, I'll give you my *opinion* on both the good and the bad so that you can make an informed decision" (emphasis in original); and

c. "Throughout the rest of this page, I'm going to do my best to explain that Sibley has a lot of good things going for it."

d. He added a list of things he liked about living in Sibley to the website.

e. He added text stating that while sometimes still present, odors from IDP are not as noticeable much of the time.

V.Compl. ¶¶ 59-61.

Shortly after making those changes to his website, a local reporter, Lana Bradstream with the N'West Iowa Review, left a voicemail with Harms indicating that he would like to speak with him about his website and about Sibley's threats of litigation. V.Compl. ¶ 62.

Almost immediately after that, Harms was contacted by another attorney with DeKoter, Thole, Dawson, Rockman, P.L.C. asking Harms to meet him for coffee to discuss the website. V.Compl. ¶ 63. At that meeting, the attorney reiterated Sibley's request to Harms that he immediately remove the website because Sibley believed it was hurting the city's image and economy. V.Compl. ¶ 64. In addition, the attorney told Harms that he knew that reporter Bradstream was trying to speak to Harms about this situation. V.Compl. ¶ 65. The attorney indicated to Harms that it would not be in Harms's best interest to do an interview with Bradstream. V.Compl. ¶ 66. In light of this verbal warning and the letter he received from the same firm, Harms was fearful of what the City would do if he was quoted in the local paper. V.Compl. ¶ 67. As a result, Harms called Bradstream back to let her know that he was declining her interview request because he was afraid he might say something that would hurt him in light of the City's threats. V.Compl. ¶ 68. He never did the interview as a result.

On Saturday, December 30, 2017, Bradstream's article, "Sibley Officials Mull 'Negative' Website," appeared in The N'West Iowa Review. V.Compl. ¶ 69; Lana Bradstream, "*Sibley*

*officials mull 'negative' website*," N'West Iowa Review, Dec. 30, 2017 [hereinafter "*Sibley*

*officials mull*"]; Ex. D. Backstream's article noted that dramatic changes had been made to

Harms' website recently. V.Compl. ¶ 70; Ex. D. Perhaps most strangely, when asked about the

letter sent to Harms, Anderson, Sibley Mayor Jerry Johnson ("Johnson"), and Council member

Larry Pedley ("Pedley") denied to the reporter that they had directed or authorized the letter to be

sent. V.Compl. ¶ 71; Ex. D. Johnson would not identify the sender to Backstrom, and he

seemingly implied a private citizen may have sent the letter, as reported in Backstrom's story:

> City administrator Glenn Anderson, mayor Jerry Johnson and city councilman
> Larry Pedley all said the city council did not authorize a letter to be sent.
>
> Johnson would not identity who wrote a letter.
>
> He said he thinks the city council said if the person writing the letter wanted to send
> the letter to the website administrator, that person could go ahead.

V.Compl. ¶ 72; Ex. D. "He said he did say "[t]here might be some legal stuff coming down the

road" and that this was "a sticky thing." V.Compl. ¶ 72; Ex. D.

Sibley City Attorney Harold Dawson also denied sending the letter to Harms. V.Compl. ¶

73; Ex. D. However, in the same article, Backstrom quoted Dawson as saying, "the website made

it sound like the [odor] problem was continuing."  V.Compl. ¶ 74; Ex. D. The City Attorney

attempted to justify the prior unconstitutional censorship by drawing a line at what he considered

to be factual versus opinion statements, stating "It was originally not an opinion piece, but stated

facts that existed two years ago." V.Compl. ¶ 75; Ex. D; Bradstream, "*Sibley officials mull*".

Likewise, Council member Pedley said that Harms' website was a detriment to Sibley

and its local economy and "[y]ou would do a search of Sibley and end up on that site." V.Compl.

¶ 76; Ex. D. The article closed by noting "[Mayor] Johnson said he hopes the website it [sic]

eventually taken down, *even the revised edition*." V.Compl. ¶ 77 (emphasis added); Ex. D.

Because of the City's instruction to Harms not to speak to the press, despite its own doing so, the story contains no statement or refutations from Harms. V.Compl. ¶ 78; Ex. D.

In the aftermath of Bradstream's article, Harms received another letter from Sibley and DeKoter, dated January 18, 2018, that reaffirmed and attempted to justify Sibley's previous threats of litigation. V.Compl. ¶ 79; Ex. E. Saying that Iowa recognized a cause of action for "slander upon title," Sibley asserted that the previous version of Harms's website "disparaged property in Sibley" and contained knowingly "factually false" statements. V.Compl. ¶ 80; Ex. E. At no point did the letter inform Mr. Harms that in fact the First Amendment allows no such action for defamation by a government against citizens critical of it. V.Compl. ¶ 8; Ex. E. Although DeKoter in one breath indicated that "this letter is not a threat of litigation and is not in any way intended to deter your exercise of your legal rights," in the other it explicitly indicated to Harms that he was only within his legal rights "to publish the web site *in its current form*." V.Compl. ¶ 83 (emphasis added); Ex. E. In fact, the January 18 letter reiterated that Harms's previous website content "affected the decision of a doctor who was looking at Sibley as a possible home." V.Compl. ¶ 84; Ex. E.

Despite Harms's desire to continue informing his fellow citizens about the IDP odor problem and his advocacy that Sibley do more to address the issue, Sibley's letters together with his coffee meeting with its attorney gave Harms the reasonable impression that the City would sue him for any speech criticizing the city, especially as related to the way it smells. *See* V.Compl. ¶ 85. Therefore, Harms has not made any additional updates or other changes to his website since December 19, 2017, despite his desire to do so. V.Compl. ¶ 86.

As a direct result of the specter of litigation, Harms has been chilled from exercising his right to criticize his local government in at least the following specific ways:

a. He would like to remove the various statements on his website that it represents only his opinion and not fact, as well as any other disclaimers he added only after the threat of litigation first arose.

b. He wants to post the December 12, 2017 letter he received from Sibley on his website to refute Sibley officials' denial in the local press that Siley sent him the letter.

c. He would have liked to, and still would like to, talk to Backstrom after her original article to correct the record; however, he was afraid that Sibley might find something Harms said to Bradstream "libelous."

d. Harms would like to add a form to his website where other Sibley residents could instantaneously report any incident of continuing odor from IDP.

e. Finally, Harms had planned to purchase the domain "sibleystinks.com" specifically for reporting IDP odors.

V.Compl. ¶ 87. Even buying the "sibleystinks.com" domain without adding any content scared Harms as the City was tracking his online life.[5] V.Compl. ¶ 88.

One of the cornerstones of our constitutional democracy is the right of to be free from viewpoint discrimination in all cases, prior restraint in nearly all cases—and certainly this case— or retaliation for engaging in protected expression like the website Harms posted. Sadly for Harms, this bedrock principle was flagrantly abused by Defendants. Harms's continuing reasonable fear of litigation has prevented him from changing or updating his website, speaking with reporters, and creating a second website to report on IDP odors. V.Compl. ¶ 90. Because the

---

[5] Sibley's December 12, 2017, letter let Harms know that Sibley officials knew when he reregistered his domain and enclosed documents showing Harms's ownership and authorship of http://shouldyoumovetosibleyia.com. V.Compl. ¶ 89.

harms to his First Amendment rights are ongoing, and not capable of redress through damages alone, Harms seeks preliminary injunctive relief to enjoin Defendants from censoring him from engaging in speech critical of Sibley, its municipal government, or the way it smells.

## ARGUMENT

### I.      Legal Standard

Federal Rule of Civil Procedure 65 gives this Court the authority to grant preliminary injunctions. A district court addressing a request for a preliminary injunction must decide "[a]t base . . . whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc. v. C.L.Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981) (en banc). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citations omitted). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* In this case, Plaintiff requires a preliminary injunction to stop ongoing injury and avoid further injury to his right to free speech protected under the First and Fourteenth Amendments. A grant of preliminary injunctive relief in this case also affirms the free speech rights of others who, like Harms, are reasonably chilled by Sibley's actions.

In considering whether to issue a preliminary injunction, the Court considers four factors: (1) whether Plaintiff is likely to succeed on the merits; (2) whether Plaintiff faces a threat of irreparable harm absent the injunction; (3) the balance of harm to the Plaintiff absent the injunction and any harm to Defendants resulting from the injunction; and (4) the public interest.

13

*See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *Child Evangelism Fellowship of Minn. V. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1000 (8th Cir. 2012).

Of these four factors, "likelihood of success on the merits is most significant." *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995) (quoting *S & M Constructors, Inc. v. Foley Co.,* 959 F.2d 97, 98 (8th Cir. 1992). "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2011) (en banc) (internal quotation marks omitted). Accordingly, when Plaintiffs are "likely to win on the merits of [their] First Amendment claim, a preliminary injunction is proper." *Id.* at 877; *see also Phelps–Roper v. Nixon* ("*Phelps-Roper v. Nixon*"), 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps–Roper v. City of Manchester, Mo.* ("*Phelps-Roper v. Manchester*"), 697 F.3d 678 (8th Cir. 2012) ("In a First Amendment case . . . the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue.")

Plaintiff Harms "'need only establish a likelihood of succeeding on the merits on any one of [his] claims.'" *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (quoting *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F.Supp.2d 230, 250 (D.D.C. 2003). In this case, Harms can establish a likelihood of success on all three of his claims under the First Amendment, although success on any of them allows for a preliminary injunction to be entered.[6]

---

[6]     For expediency, Harms presents only three of his four claims in this brief supporting his motion for a preliminary injunction, leaving the final count for conspiracy to violate constitutional rights for a later stage.

## II.    Plaintiff Will Likely Prevail on the Merits of His Claims

A party seeking a preliminary injunction in any case other than a challenge to a state or federal statute[7] must demonstrate a "fair chance of prevailing" on the merits. *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014). In making this showing, the movant is not required to "prove a greater than fifty percent likelihood that [it] will prevail on the merits." *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) (quoting *Dataphase*, 640 F.2d at 113). Harms's claims easily meet this standard.

### A.  Claim 1: First Am. Retaliation.

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... on the basis of his constitutionally protected speech." *Osborne v. Grussing*, 477 F.3d 1002, 1005 (8th Cir. 2007); *O'Toole v. City of Walnut Grove, Missouri*, 275 F. Supp. 3d 1114 (W.D. Mo. 2017); *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

To prevail in an action for First Amendment retaliation, a plaintiff must show three things: (1) that he engaged in protected activity; (2) that government officials took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) the adverse action was motivated at least in part by the exercise of the protected activity, *i.e.*, that there is a causal connection between the retaliatory animus and the injury. *See Bennie v.*

---

[7]    Parties who seek to enjoin the enforcement of state or federal statutes must establish a greater than fifty percent likelihood of success on the merits, because state or federal legislative policies result from "presumptively reasoned democratic processes." *1-800-411-Pain Referral Serv.*, 744 F.3d at 1054 (emphasis omitted) (quoting *Rounds*, 530 F.3d 724, 731-33 (8th Cir. 2008) (en banc). However, no such presumption exists in the case of the municipal policies or actions challenged here, and the lesser "fair chance of prevailing" standard applies. *Rounds*, 530 F.3d at 732 n.6; *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam) (policy at issue was not resulting from "the full play of the democratic process involving both the legislative and executive branches.").

*Munn,* 822 F.3d 392, 397 (8th Cir. 2016) (citing *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir. 2004)). "Retaliation need not have been the sole motive, but it must have been a 'substantial factor' in" the government's decision to respond in the way it did. *Baribeau*, 596 F.3d at 481 (citing *Kilpatrick v. King,* 499 F.3d 759, 767 (8th Cir. 2007) (*quoting Wishnatsky v. Rovner,* 433 F.3d 608, 613 (8th Cir. 2006))). Plaintiffs must prove that the retaliatory motive was a "but-for" cause of the government's action—that they were singled out because of their exercise of constitutional rights. *Baribeau*, 596 F.3d at 481.

Harms' speech about Sibley in this case—especially that which criticizes or is derogatory about his local government—is core political speech. Political speech gets the highest level of protection, and may not be regulated unless the regulation is narrowly tailored to serve a state interest of the highest order. *Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 340 (2010); *McIntyre v. Ohio Elections Com'n*, 514 U.S. 334, 347 (1995).

Indeed, there was no lawful basis for the attorney for the City of Sibley to threaten Mr. Harms with litigation for libel or slander; no such action lies by a government against the citizenry, to whom it is accountable. In the City's attorney's second letter to Mr. Harms, he affirmed and defended his approach in the prior letter as correctly threatening a lawsuit for "slander of title." He explained:

> The website in its previous form was disparaging property in Sibley. That in turn would lead, and I believe has led, to reduction in taxable value of the property that forms the city's tax base, especially property in the vicinity of the plant. Malice is shown in this instance by the fact that you renewed the domain name registration of the website this past summer to keep it alive, despite the progress made; specifically chose a website name targeted to people who would want to locate and buy property in Sibley; and continued to include a statement on the web page which claimed it was current as of every viewing date for anyone viewing it. As of the time I wrote you, your web site claimed to reflect current reality, so the statements were factually false. You are a web site developer and certainly knew you were continuing to publish information that was no longer true, but was being presented

as if it were. The city has an interest in the property being slandered because it constitutes its taxable base.

In short, that line of reasoning was the legal and factual basis for the threat of litigation.

Ex. E.

That is an incorrect statement of law. Municipal defamation/libel is not actionable, and there was no legal basis to threaten such suit. Put simply, a government entity itself cannot bring a libel or defamation action. In *281 Care Comm.*, the Court explained, "The importance of private interests to the foundations of defamation-law principles prevents us from assuming its applicability to knowingly false political speech. A government entity cannot bring a libel or defamation action." *281 Care Comm. v. Arneson*, 638 F.3d 621, 634 (8th Cir. 2011) (hereinafter "*281 Care Comm. I*") (citing *NY Times v Sullivan*, 376 U.S. 254, 291 (1964) (noting no court "of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of jurisprudence."). Indeed, "criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). *See also 281 Care Comm. v. Arneson*, 766 F.3d 774, 783-84 (8th Cir. 2014) (affirming *281 Care Comm. I* and explaining that false political speech is more protected even than false speech in *Alvarez*, and is subject to strict scrutiny).

While Mr. Harms' website was fairly obviously presenting his opinions about government inaction and the smell in town, even prior to the changes he made to the website,

and the information he presented was not demonstrably false,[8] for First Amendment purposes, it would not matter to this case even if they were. The idea that the government may sue citizens for criticizing it is totally antithetical to the purpose of the First Amendment. As the 8th Cir. explained in *281 Care Comm.*, even false speech about the government is "quintessential political speech," subject to the highest order of First Amendment protection:

> After finding that Supreme Court precedent does not currently recognize knowingly false speech as a category of unprotected speech, we also decline to, ourselves, establish it as such. Although defendants may be correct that knowingly false speech is, itself, often valueless, the First Amendment does not allow the courts of appeals to decide whether a category of speech, on the whole, tends to contain socially worthless information. *See United States v. Stevens,* 559 U.S. 460, 130 S.Ct. 1577, 1585, 176 L.Ed.2d 435 (2010) ("The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits."). The Court recently labeled the government's advocacy of such an approach "startling and dangerous." *Id.* Prior decisions that have discussed the worthlessness of speech categorically excepted from the First Amendment are descriptive not prescriptive—they tell us something about the speech that is exempt but not about what other types of speech may be exempt from First Amendment scrutiny. Thus, even if we were convinced that knowingly false speech was generally valueless, we could not on that basis make a judgment that it falls outside the protections of the First Amendment because "[t]he

---

[8]      In a defamation case—where a *non-governmental person* is the plaintiff, that is, in a case unlike this one, a statement on matters of public concern must be provable as false before there can be liability under state defamation law. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990).

However, a mere showing of falsity alone is not sufficient to take speech outside of the realm of First Amendment protection. Though the Supreme Court has stated on numerous occasions that false speech itself has no constitutional value, the Court has also clarified that there is no general exception to First Amendment protection for false statements because "some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation." *United States v. Alvarez*, 567 U.S. 709, 718 (2012) (plurality op.).

Overbroad prohibitions on false statements harm First Amendment values by chilling true statements. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Put another way, "[t]he First Amendment requires that [courts] protect some falsehood in order to protect speech that matters*.*" *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974).

First Amendment itself reflects a judgement by the American people that the benefits of its restrictions on the Government outweigh the costs." *Id.*

We are especially unwilling to do so here because the speech involved (i.e., speech about ballot initiatives) is quintessential political speech, which is at the heart of the protections of the First Amendment.[3] *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.").

*281 Care Comm I*, at 635.

Three years later, following the *Alvarez* decision, the Eighth Cir. reaffirmed that analysis

in *281 Care Comm. II*:

Justice Breyer in his concurring opinion in *Alvarez* recognized the significant difference between the false speech regulated by the Stolen Valor Act and other areas of false speech, including false political speech, acknowledging that strict scrutiny is often the test to apply, and noting that almost no amount of fine tailoring could achieve a similar government interest in a political context:

> I recognize that in some contexts, particularly political contexts, such a narrowing will not always be easy to achieve. In the political arena a false statement is more likely to make a behavioral difference (say, by leading the listeners to vote for the speaker) but at the same time criminal prosecution is particularly dangerous (say, by radically changing a potential election result) and consequently can more easily result in censorship of speakers and their ideas.

*Id.* at 2556 (Breyer, J., concurring). . . .

So, again, it is *key* that the regulatory scheme at play in *Alvarez* dealt entirely, and only, with false speech. *Alvarez,* 132 S.Ct. at 2545 (plurality) ("[T]he Stolen Valor Act ... targets falsity and nothing more."). In fact, it was largely (if not solely) because the regulation at issue in *Alvarez* concerned false statements about easily verifiable facts that did not concern subjects often warranting greater protection under the First Amendment, that the concurring Justices applied intermediate scrutiny. *Id.* at 2552–53 (Breyer, J., concurring). Here, because the speech at issue occupies the core of the protection afforded by the First Amendment, we apply strict scrutiny to legislation attempting to regulate it. *Iowa Right To Life Comm.,* 717 F.3d at 589. Accordingly, because *Alvarez* does not alter the landscape on this issue, the scrutiny directed in *281 Care Committee I* endures.

*281 Care Comm. II*, 766 F.3d at 783–84.

The *281 Care Comm.* cases are likewise instructive because there—like Mr. Harms, who intends to be truthful but reasonably fears the City's aggressive policing of his speech will lead it to determine his facts are outdated and thereby have become false—the plaintiffs there had "not alleged that they wish to knowingly make false statements of fact." *Id.* at 628. Like Harms, Plaintiffs had however *"alleged that they wish to engage in conduct that could reasonably be interpreted as making false statements with reckless disregard for the truth of those statements and that, therefore, they have reasonable cause to fear consequences [of the challenged prohibition on false statements about ballot initiatives.]" Id.* at 628 (finding "this is enough to establish that plaintiff's decision to chill their speech was objectively reasonable.")

Nor did the City of Sibley have any legitimate or defensible basis to tell Mr. Harms not to talk to the news reporter about his website, or his dispute with the city regarding his website, out of a desire to preempt Harms from further criticizing Sibley publicly. To the contrary, Harms's online speech and speech to a local newspaper reporter was precisely the type of political speech robustly armored against censorship by the First Amendment and subject to strict scrutiny. Because there is no cause of action by governments for defamation, the Defendants' threat to sue Harms was not a genuine attempt to enforce the law, but instead an attempt to force him to retract, alter, and cease from further speech critical of Sibley's odors or its government's inability to make the odors cease.

Here, the Defendants took adverse action against Harms that not only did chill his expressive activity, it would chill any person of ordinary firmness from continuing in the activity. The "ordinary-firmness" test is an "objective one, not subjective." *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013). It requires that the action "would chill a person of ordinary firmness from continuing in the protected activity." *Id.; Revels*, 382 F.3d at 876; *Garcia v. City*

*of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003). While the question is not whether the plaintiff himself actually was deterred, evidence that he was chilled is relevant evidence to determine what a reasonable person in his shoes would have done. *Id.*

In this case, the evidence of chill is abundant. Specifically, Harms has been chilled from continuing to engage in any political speech, including "derogatory" speech (to quote the demand letter, Ex. A), but has been chilled from doing so because of the threat of litigation by the City of Sibley. The various protected expression he would engage in but for the City's threats include:

- Changing the website to include his "current as of" date-programming again;

- Removing the various statements that the website represents only his opinion and not fact and any other disclaimers he added only after threat of litigation;

- Both online and in comments to the press, engaging in criticism of the city of Sibley, and its elected officials who constitute local government, as well as the tactics of its hired counsel, without concern about threat of litigation or other negative repercussions by the government

- Expanding on the fact that the smell is still a problem, and point out expressly that it is not fixed like they say it is. He avoided emphasizing that because of the threat of litigation.

- Publishing the letters they have sent to him on the website to prove they sent them, since they denied doing so in local press. He hasn't done that because he was afraid of the threatened defamation lawsuit.

- Pointing out that city officials have made untrue statements to the press all while accusing him of putting untrue statements on his website. As it is, he and all

others in the town who know about the threat of litigation are chilled from

engaging in a free and open criticism of their local government.

V.Compl. ¶ 87.

The reasonableness of this chill is further demonstrated by the fact that the letter came from an attorney representing his local government, and that a second, independent attorney Harms consulted in Sibley recommended modifying his website. V.Compl. ¶¶ 58-59.

The fact that Defendants continued to assert that the prior website was actionable while the new altered and censored website is permissible also represents a concrete, ongoing threat that continues to reasonably chill Harms's speech. (Ex. E) ("You are of course within your legal rights to publish the web site *in its current form*, although my personal opinion is that you would do better to spend your time doing something more helpful to the community…") Additionally ominous were the Mayor's comments to the local press regarding Sibley's censorship of Harms, that "[t]here might be some legal stuff coming down the road" and that "he hoped the website would "eventually [be] taken down, even the revised edition." V.Compl. ¶¶ 72, 77; Ex. D. Finally, the city went out of its way to communicate to Harms that it was actively monitoring his speech, informing Harms in its December 12, 2017 letter that Sibley officials knew when he re-registered his domain, enclosing documents showing Harms's ownership and authorship. V.Compl. ¶ 89. A person of ordinary firmness would be chilled from further speech—even anonymous speech—as Harms was, deciding it was too risky to create a second website, www.sibleystinks.com, or talk to the press. V.Compl. ¶¶ 68, 88.

Harms actually was, as any reasonable person of ordinary firmness would be, deterred from talking about Sibley's stink, or about local government, because Sibley made plain its intent to block and punish such speech with an expensive and time-consuming lawsuit. *See also*

*281 Care Comm. I* at 630 (stating that threatened, non-criminal consequences are sufficient to show objective reasonableness of alleged chill and specifically referencing months and $1,900 in attorneys fees to litigate matter) (citing *Babbitt*, 442 U.S. at 302 n.13) (discussing the chilling effect of possible administrative and civil sanctions); *281 Care Comm. II*, 766 F.3d at 781-82 (reiterating and affirming *281 Care Comm. I*'s rationale).

Finally, Defendants' retaliatory motive was the sole reason behind (and therefore also a substantial and but-for cause of) Defendants' actions in this case. This retaliation was a direct result of Harms's exercise of his constitutionally assured right of free expression, as set forth by the Defendants in their various legal letters, representations by counsel, city council minutes, and statements to the press. In its initial demand letter, the City made clear that the content and viewpoint of Harms' speech was the basis for its threatening Harms with litigation, specifically mentioning a physician prospect who read it and decided not to relocate to Sibley and the fact that it was "derogatory." Ex. A. Likewise, the City instructed Harms not to speak with the press about the City's own censorship efforts in sending the letter because doing so would reflect poorly on Sibley and could expose Harms to a lawsuit. V. Compl. ¶¶ 63-68. Anderson and Sembach investigated and reported on Harms' website to the City Council on December 17 because "it voice[d] concerns as a deterrent to someone considering moving to Sibley based on the IDP odor issue." Ex. B. It was for that reason they were "working with the city attorney to attempt to remove the site." Ex. B. As reported by the local reporter, the reason Defendants sent the threatening letter was Harms' "negative website regarding moving to Sibley." Ex. C.

Statements by Sibley officials to the press plainly explained this causal relationship between Harms' protected speech and the city's retaliation. Ex. D. City Attorney Harold Dawson said "the website made it sound like the issue [of the smell] was continuing." Ex. D. "They

wanted to make sure it was corrected." Ex. D. "It was originally not an opinion piece but stated facts that existed two years ago." Ex. D. City Councilman Larry Pedley further explained the City's rationale: "The City wanted it changed or taken done because it was thought it might be hurting the city." Ex. D. "You would do a search of Sibley and end up on that site." Ex. D. Finally, as the City's attorney made express, Harms "specifically shoes a web site name targeted to people who want to locate and buy property in Sibley; and continued to include a statement on the web page which claimed it was current as of every view date." Ex. E. The previous web content "affected the decision of a doctor who was looking at Sibley as a possible home." Ex. E.

Thus, each and every one of the numerous stated rationales for Defendants' retaliation against Harms are references to displeasure with statements made by Harms that were protected under the First Amendment. Those statements which were the cause of concern were the object of Defendants' censorship, as Defendants expressly stated all along the way. Harms is therefore likely to succeed on the merits of his First Amendment retaliation claim.

### B. Claim 2: Prior Restraint.

Harms is also likely to succeed on the merits of his prior restraint claim.

A prior restraint is generally any governmental action, be it statutory, administrative, judicial, or other type of action, to block speech based on content, before it takes place. restricts speech in advance on the basis of content and carries a presumption of unconstitutionality. *See R.A.V. v. City of St. Paul,* 505 U.S. at 382–83; Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 978–79 (4th ed. 2011).

The United States Supreme Court has condemned prior restraints, elucidating the principal that "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity" in a seminal case. *Bantam Books, Inc. v.*

*Sullivan,* 372 U.S. 58, 70 (1963) (internal citations omitted). Informal procedures undertaken by officials and designed to chill expression can constitute a prior restraint. *See Bantam Books, 372 U.S. 58 (1963)*; *Multimedia Holdings Corp. v. Circuit Court of Florida, St. Johns Cty.*, 544 U.S. 1301, 1306, 125 S. Ct. 1624, 1627, 161 L. Ed. 2d 590 (2005). *See also* Michael I. Meyerson, *Rewriting Near v. Minnesota: Creating a Complete Definition of Prior Restraint*, 52 Mercer L. Rev. 1087, 1095 (2001) ("[T]he only governmental activity relating to speech permitted "prior" to communication is that of the legislature creating a general rule. . . There is no role for either the executive branch or the judicial branch . . . both are barred from taking action on expression before communication.")

The First Amendment protection against prior restraint of speech is implicated if a restraint on speech places unbridled discretion in the hands of a government official or agency to determine whether certain speech will be allowed, and the relevant question is whether the challenged regulation authorizes suppression of speech in advance of its expression. *Iowa Right to Life Comm., Inc. v. Tooker*, 133 F. Supp. 3d 1179 (S.D. Iowa 2015) Likewise, a government regulation is a prior restraint when it requires obtaining permission from government officials to engage in protected expression. *See Near v. Minnesota,* 283 U.S. 697, 713 (1931); *Books, Inc. v. Pottawattamie Co.*, 978 F.Supp. 1247, 1254 (S.D. Iowa 1997) (Pottawattamie County's ordinance requiring license to sell or distribute books relating to specified sexual activities, *inter alia*, was unconstitutional prior restraint). Affording unbridled discretion to a government official or agency to determine whether a person may engage in speech "constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 757 (1988). Suppression of speech based on the government's concerns about what the speaker might say is a classic form of prior restraint. *Se. Promotions, Ltd. v. Conrad,* 420 U.S.

546, 556-57 (1975) (city's denial of application to perform musical Hair on the basis of outside reports from which it concluded performance would not be 'in the best interest of the community' was impermissible prior restraint); "[T]he mere existence of ... unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id.* As such, prior restraints carry a heavier presumption against constitutionality than regulations that subsequently punish speech because of formidable "risks of freewheeling censorship." *Se. Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559 (1975); *Am. Civil Liberties of Missouri Found. v. Lombardi*, 23 F. Supp. 3d 1055, 1061–62 (W.D. Mo. 2014).

The Court has explained the underpinnings of such rigorous presumption against prior restraints is related to the very functioning of a free and democratic society:

> Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

Se. Promotions, Ltd. v. Conrad, 420 U.S. at 559 (citations omitted).

Thus, prior restraints on speech are subject to strict and exacting judicial scrutiny. The United States Supreme Court has held that a prior restraint is justified "only where the evil that would result from the [speech] is both great and certain and cannot be mitigated by less intrusive measures." *CBS, Inc. v. Davis,* 510 U.S. 1315, 1317 (1994). Examples are matters implicating national security, *Near v. Minnesota*, 283 U.S. 689 (1931). *See also In re Goode*, 821 F.3d 553, 559 (5th Cir. 2016) ("Generally, a prior restraint is constitutional only if the Government 'can establish that the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest.'") (internal citations and quotations omitted).

Case 5:18-cv-04023-LTS   Document 6   Filed 03/12/18   Page 26 of 35

Even serious private harm to individuals does not warrant prior restraint. There is, for example, broad agreement that judges may not enjoin defamatory statements; relief is limited to damages in any ordinary circumstance. Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. 157, 163 (2007); Meyerson, *Rewriting Near v. Minnesota* at 1136–37.

Here, the Defendants have imposed a prior restraint against Harms on any speech that the City determines, with unfettered discretion, is "false," "negative," or "derogatory." Exs. A-E. It has made clear to Harms that should it ignore its instructions to limit himself to stated opinion or laudatory speech about Sibley, his "next notice will be in the form of a lawsuit." Ex. A. Harms was not merely told to take down his website; he was told not to replace it "with other derogatory material." V.Compl. ¶ 56; Ex. A. He was later instructed not to speak to the press about the way Sibley smelled or, ironically, about their censorship of him. V.Compl. ¶ 63-68.

Harms has a clearly established right under the First Amendment to publish speech regarding Sibley which is negative, derogatory, and even false (although Harms disputes that any content was actually false), whether that be online and spoken to the press. Despite that clearly established right, the Defendants' actions in prohibiting Harms from replacing his website with other derogatory material or for speaking with a reporter about his website at the threat of litigation constituted a prior restraint on his speech. Ex. A; V.Compl. ¶ 63-68. That prior restraint reasonably kept him from controlling the content of http://shouldyoumovetoSibleyIA.com, kept him from speaking with reporter Bradstrom, and kept him from purchasing and developing a new site, www.SibleyStinks.com. V.Compl. ¶¶ 68, 87.

Defendants will not be able to meet their burden under strict scrutiny to show this prior restraint was justified. In this case, the government had no compelling reason to censor Harms. The alleged harm to the city of Sibley is both theoretical and reputational—not any sort of great

and certain evil—indeed, not one even properly asserted as a legitimate government purpose in light of *281 Care Comm. I and II*, and *New York Times*, discussed *supra*.[9] To the contrary, Sibley's actions undermined robust and free debate regarding the government.

 Other less intrusive measures that involved no suppression of speech clearly presented themselves. As with most speech that is found to be offensive by the listener or audience, the solution is more speech countering that speech, not censorship of the offensive speech. In this case, the City could easily have spent the resources it expended on legal fees to suppress Harms' First Amendment rights to create its own website encouraging people to move to Sibley and demonstrating that it had (to the extent it actually had) remedied the odor problem. Indeed, even when it came to the city's interest in recruiting doctors to the area, it could have developed targeted promotional materials for that purpose. A host of alternative means to promote the good reputation of Sibley existed, but rather than entertain any of them, Defendants instead sought to restrain Harms from exercising core political speech.

---

[9] Illustrating this principal is the fact that to be deprived of First Amendment protection in the case of defamation actions (by non-governmental plaintiffs, of course), false statements must cause a "legally cognizable harm" or provide a "material gain" for the speaker. *Id.* at 718, 723. Only "specific and tangible" injuries are legally cognizable in this context. *Animal Legal Def. Fund v. Wasden*, -- F.3d --, at 1194, No. 15-35960, 2018 WL 280905 (9th Cir. Jan. 4, 2018) (citing Alvarez, 567 U.S. at 734-36 (Breyer, J., concurring)).

Thus, applying *Alvarez* to a challenge of Idaho's law "ag gag" law restricting, *inter alia*, misrepresentation to gain employment at an agricultural facility by those intended to cause harm, the Ninth Circuit Court of Appeals recently found that cognizable harm does not include the type of "reputational damages" that flow from the exposés typical of employment-based undercover investigations. *Wasden*, 2018 WL 280905 at *12. There, applying the rule that "'[w]here an unconstitutionally broad statute is readily subject to a narrowing construction that would eliminate its constitutional deficiencies,'" the Ninth Circuit construed the employment subsection *to exclude* those who misrepresent themselves to gain employment who only intend to cause "reputational and publication" injuries. *Id.* The Southern District of Iowa recently cited the *Wasden* analysis with approval in denying the state's motion to dismiss a similar challenge to Iowa's "ag gag" law. *ALDF v. Reynolds*, No. 4:17-cv-362, Ord. on Mot. to Dismiss at 25-31 (S.D. Iowa Feb. 27, 2018).

Because Defendants will not be able to meet the exacting scrutiny of the First Amendment to justify the prior restraint it imposed on Harms, he is likely to succeed on the merits of his prior restraint claim.

### C. Claim 3: Viewpoint Discrimination.

Harms is likewise likely to succeed on the merits of his viewpoint discrimination claim.

The First Amendment prohibits the government from discriminating or targeting speech based on a viewpoint that the speaker seeks to express, regardless of the nature of the forum. Viewpoint discrimination, or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker, is an egregious and blatant form of content discrimination. *See Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015); *Wood v. Moss*, 134 S. Ct. 2056 (2014).*Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829 (1995). Unlike content-based restrictions, subject to forum analysis-based judicial scrutiny, for example, viewpoint discrimination by the government of private speech is flatly prohibited— beyond the reach of government. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 391–92 (1992) (holding that a state may not selectively ban fighting words on the basis of viewpoint, even though it may ban fighting words entirely). *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 741 F. Supp. 2d 1115 (D. Minn. 2010); Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. CHI. L. REV. 413, 443-502 (1996).

Indeed, preventing the government from engaging in viewpoint discrimination has long been the central concern of the First Amendment. *See, e.g.,* Joseph Blocher, *Viewpoint Neutrality and Government Speech*, 52 B.C.. L. Rev. 695, 703-05 (2011). Thus, the government must abstain from regulating speech when a specific motivating ideology or opinion or perspective of

the speaker is the rationale for the restriction. *Rosenberger*, 515 U.S. at 829. Viewpoint

discrimination is "censorship in its purest form and government regulation that discriminates

among viewpoints threatens the continued vitality of free speech." 16A Am. Jur. 2d

Constitutional Law § 476.

> In *R.A.V.,* the majority stated:

> What they mean is that these areas of speech can, consistently with the First
> Amendment, be regulated because of their constitutionally proscribable content
> (obscenity, defamation, etc.)—not that they are categories of speech entirely
> invisible to the Constitution, so that they may be made the vehicles for content
> discrimination unrelated to their distinctively proscribable content. Thus, the
> government may proscribe libel; but it may not make the further content
> discrimination of proscribing only libel critical of the government.

*R.A.V.*, 505 U.S. at 383–84 (thus allowing content discrimination to stand should it withstand

First Amendment heightened scrutiny, but never permitting viewpoint discrimination even

within a categorically proscribed area of speech).

Here, Defendants' threat of litigation at issue in this case was clearly premised on the fact

that the website was 'negative' or 'derogatory.' The City singled out Harms's website

specifically because of its criticism of Sibley—content that is laudatory about Sibley is subjected

to no similar harsh treatment (including investigation of Harms's speech, review for factual

accuracy, and of course, threat of litigation). V.Compl. ¶¶ 46-57, 62-68, 74-80, 83-84; Exs. A-E.

Even the content that was purportedly outdated on Harms' website was only targeted because it

was also derogatory. *Id.*

Indeed, in drawing the line it did, Sibley stated to Harms that he was only within his legal

rights "to publish the web site *in its current form*" (once Harms's had chilled his previous speech

and added statements that were positive about Sibley, like listing restaurants he enjoys eating at)

V.Compl. ¶ 83 (emphasis added); Ex. E. This restriction of Harms' speech that is negative in

view about Sibley, while permitting his speech which is positive in view about Sibley, is precisely the sort of pernicious attempt at thought-control undermining of a free and democratic society that the First Amendment simply has no tolerance for. As the Supreme Court has held in no uncertain terms, "If there is a bedrock principle underlying the First Amendment it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive." *See Texas v. Johnson*, 491 U.S. 397, 414 (1989). That is, even *arguendo* were the City of Sibley able to regulate false speech about Sibley's smelliness, which it cannot do, it could not favor speech claiming Sibley smelled like a fresh breeze, roses, or pine trees, while disfavoring Harms's speech proclaiming it smelled instead like the blood plant that moved in across the street from him.

Therefore, Harms is likely to succeed on the merits of all three First Amendment claims.

## III. Plaintiff Is Suffering Irreparable Harm

The next *Dataphase* factor for the Court to examine is whether the Plaintiffs will suffer irreparable harm in the absence of injunctive relief. *Dataphase Systems, Inc.*, 640 F.2d at 114. Put simply, this viewpoint-based prior restraint on and retaliation for Harms' exercise of his core, political speech rights is constitutionally abhorrent and repugnant. *See Wayte v. United States*, 470 U.S. 598, 607–08 (1985) ("the decision to prosecute may not be deliberately based on . . . arbitrary classification, including the exercise of protected statutory and constitutional rights."); *United States v. Goodwin*, 457 U.S. 368, 372 (1982) ("For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right.")

Even a temporary violation of First Amendment rights constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury."). Here, Plaintiff seeks the remedy of preliminary injunctive relief because Defendants' actions violate his First Amendment rights. Indeed, the ongoing threat of litigation has had a profound chilling effect on Harms' ability to express himself by saying anything critical in print or verbally about Sibley. V.Compl. ¶ 87.

The inability of compensatory monetary damages to make Plaintiff whole in this case further requires immediate injunctive relief to prevent further harm during the pendency of this lawsuit.

Finally, beyond the grievous injury to his core political speech rights and the opprobrium of living under a local government censor, part of the harm that Defendants are continuing to cause Harms stem from his inability to correct the record regarding the threat of litigation sent to him by posting the letters on his website, as well as allow his fellow Sibley residents to log complaints about odor. V.Compl. ¶¶ 78, 87. *See, e.g.*, *Thrasher v. Grip-Tite Mfg. Co.,* 535 F. Supp. 2d 937, 944 (S.D. Iowa 2008) ("'Loss of intangible assets such as reputation and goodwill can constitute irreparable injury,' as those items are not readily compensable by monetary damages." (quoting *United Healthcare Ins. Co. v. AdvancePCS,* 316 F.3d 737, 741 (8th Cir. 2002)); *cf. O'Connor v. Peru State Coll.,* 728 F.2d 1001, 1003 (8th Cir. 1984) (finding potential harm from termination of employment "is not necessarily irreparable and . . . can be compensated for by money damages").

For these reasons, Plaintiff demonstrates that he faces irreparable harm from Defendants' threats and actions.

## IV.    The Balance of Hardships Favors Plaintiff

The third factor courts must examine is harm to the non-moving party. *Dataphase Systems, Inc.*, 640 F.2d at 114.  This balance of equities, too, generally favors the constitutionally

protected freedom of expression, such that when a likelihood of success on the merits on a First Amendment claim has been shown, it will typically necessarily determine this factor under *Phelps-Roper v. Nixon*, 545 F.3d at 690 (8th Cir. 2008) ("It is always in the public interest to protect constitutional rights."), *overruled on other grounds by Phelps-Roper v. Manchester*, 697 F.3d 678 (8th Cir. 2012).

In this case, as discussed *supra*, no cognizable harm would come to Defendants, the non-moving party, by enjoining them from further unconstitutionally censoring Harms in speaking negatively about Sibley or the way it smells. Rather, the government can be thought of to exist first and foremost to protect the rights of the people, a purpose which is undermined, not furthered, by the Defendants' conduct. Any harm to the non-moving party, if there is any at all, is clearly insignificant and outweighed by the harm to the Harms' First and Fourteenth Amendment rights from not granting the injunctive relief.

## V.     Granting a Preliminary Injunction for Plaintiff Will Further the Public Interest

Satisfying the final *Dataphase* factor, issuing an injunction in this case is the public interest. The courts unsurprisingly find that the public interest is served by protecting constitutional rights. *Phelps-Roper v. Nixon*, 545 F.3d at 690, *overruled on other grounds by Phelps-Roper*, 697 F.3d 678. However, because the district courts are nonetheless directed by the Court of Appeals to award preliminary injunctive relief only upon weighing all four factors, *Dataphase Systems, Inc.*, 640 F.2d at 114, it is important to point out the specific manner in which the public interest weighs in favor of injunctive relief.

In this case, what is at stake is the ability of all people to criticize the City of Sibley. The enormous chilling effect of Defendants' actions upon all residents of Sibley to engage in political speech is especially profound. The message is clear: talk openly about the way Sibley smells and

you might face a lawsuit. Without this Court's acting to protect Harms' and all Sibley residents from Defendants' overreach, they will continue to suffer the irreparable intrusion into their civil liberties, with a profound chilling effect on them and others throughout Iowa.

## CONCLUSION

Joshua Harms is a well-intentioned and civically-engaged private citizen who sought to spur his local government to action by doing exactly what the First Amendment assures him he can: complain about it. His website may have been provocative in the eyes of Defendants, but it was protected. He is not a "perpetrator," as he was described by his own City Council. Ex. B. He does not "want to do harm to [his] fellow citizens" as alleged by the City of Sibley. Ex. A. Nor is he a liar acting with "malice" by expressing his view that the bad smells continue "despite the progress made", Ex. E, as Defendants have expressed, including to the press in his hometown. Exs. B-D. But without this Court's protection, he stands to be subjected to all manner of gross overreach by the Defendants to limit his protected political speech as well as the speech of others, to quash public debate about local government, and to stigmatize him from his community in the press while quashing his ability to respond to defend himself.

For the foregoing reasons, Plaintiff respectfully seeks a preliminary injunction prohibiting the Defendants from restraining his speech based on viewpoint, enjoining Defendants from threatening or bringing a lawsuit against Harms for publishing his website or any website that criticizes Defendants or how Sibley smells, and from blocking his ability to speak to the press about Defendants or how Sibley smells.

March 8, 2018.

34

Respectfully submitted,

/s/ Rita Bettis
Rita Bettis, AT0011558
ACLU OF IOWA FOUNDATION, INC.
505 Fifth Ave., Ste. 808
Des Moines, IA 50309–2317
Telephone: 515.243.3988
Fax: 515.243.8506
rita.bettis@aclu-ia.org

*s/Glen S. Downey*
Glen S. Downey                    AT0012428
DOWNEY & MUNDY, PLLC
303 E. Court Avenue
Des Moines, IA  50309
Tel: (515) 288-1552
Fax: (515) 259-7599
glen@downeymundy.com
nathan@downeymundy.com

*Attorneys for Plaintiff*